## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

| | |
|---|---|
| MICHAEL RUFF,<br>10319 Glen Road<br>Potomac, MD 20854 | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| PAMELA RYCKMAN,<br>501 East 79th Street, Suite 15D<br>New York, NY 10104 | )<br>)<br>) |
| and | )<br>) |
| HACHETTE BOOK GROUP, INC.,<br>1290 Avenue of the Americas<br>New York, NY 10104 | )<br>)<br>) |
| Defendants. | )<br>) |

Case No. _____     C-15-CV-24-005873

### COMPLAINT

Plaintiff, Michael ("Mike") Ruff of Montgomery County, Maryland, by undersigned counsel, files this Complaint against defendants Pamela Ryckman and Hachette Book Group, Inc., averring as follows:

### NATURE OF ACTION

1.    A true story about Dr. Candace Pert, an internationally recognized research scientist, was apparently less interesting, less profitable to defendants Pamela Ryckman, an author, and Hachette Book Group, Inc., her editor and publisher, so defendants added a "villain" to spice up the story:  Mike Ruff, Candace's husband, the "greedy" fraudster and criminal, who sought to "profit from [Candace's] brilliance."  This addition defamed Mike and placed him in a false light.[1]

---

[1] Unless otherwise indicated, all quoted material comes from the Book (defined below).

1

2.      Defendants published this story in a book, "Candace Pert | Genius, Greed, and Madness in the World of Science" (the "Book"), in November 2023, in hardcopy and online in Maryland, other states, and internationally.   In the Book, defendants falsely accuse Mike of deceiving the government, violating drug laws, defrauding investors, and if that weren't enough, perhaps having some involvement in the "uncanny" death of Candace in 2013.

3.      Defendants knew or should have known their defamatory statements were false. Their own document sources disproved or failed to prove the truth of the statements.   Public information did the same.   Their witness sources were incredible and biased.   But the truth would not stop defendants.   It would not fit their pre-conceived narrative.

4.      In the end, defendants intentionally turned their biography about Candace into a more fantastic and saleable, yet false, hit piece about Mike.   The defamatory statements caused him significant harm.   He has suffered damage to his personal and professional reputation, emotional distress, mental pain and suffering, embarrassment, humiliation, and aggravation, all of which continues to this day.   Mike now seeks to hold defendants accountable.

## PARTIES

5.      Plaintiff Mike Ruff is a citizen of Maryland who resides in Potomac, Maryland.

6.      Defendant Pamela Ryckman is a citizen of New York who resides in New York City.

7.      Defendant Hachette Book Group, Inc. is a Delaware corporation headquartered in New York City with offices throughout the United States.

## JURISDICTION & VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to Maryland Code Ann., Cts. & Jud. Proc. § 1-501.

9.     This Court has personal jurisdiction over defendants pursuant to Maryland Code Ann., Cts. & Jud. Proc. §§ 6-103(a), (b)(1), (b)(3), and (b)(4) because they, directly and by agents, transacted business in Maryland, caused tortious injury in Maryland by acts and omissions in Maryland, and caused tortious injury in Maryland by acts or omissions outside Maryland under circumstances where they regularly do or solicit business in Maryland and engage in other course of conduct in Maryland, deriving substantial revenue from business and sales in Maryland.

10.     Defendants, directly and by agents, developed and made their defamatory statements, in whole or in part, in Maryland; traveled to Maryland in connection with the defamatory statements; communicated in person, by phone, and in writing with persons in Maryland in connection with the defamatory statements; and published the defamatory statements in Maryland through bookstores, direct sales, and the internet where the statements were read.

11.     Defendants, directly and by agents, also directed their defamatory statements toward a Maryland audience. Maryland is where Mike resides and suffered the most harm, and where Candace lived and died. Defendants reference Maryland in these and other contexts in the Book, including where Mike and Candace worked at National Institutes of Health ("NIH") laboratories in Bethesda, Maryland; where Mike and Candace worked at Rapid Pharmaceuticals in Potomac, Maryland; where Mike and Candace owned property on Tilghman Island in the Maryland part of the Chesapeake Bay; and where other family members live in Maryland.

12.     In addition, defendants, directly and by agents, have continuously and systematically authored and/or published books, advertised, and derived revenue from sales,

3

including sales of the Book in Maryland through bookstores, direct sales, and the internet.

13.    Defendants have sufficient minimum contacts with Maryland such that this State has specific jurisdiction over them. Defendants engaged in the privilege of conducting business within Maryland, and Mike's claims arise out of those activities. The exercise of personal jurisdiction over defendants would not offend the notions of fair play and substantial justice, as defendants engaged in deliberate significant activities within Maryland, and defendants have continuing obligations within this State.

14.    This Court is a proper venue pursuant to Maryland Code Ann., Cts. & Jud. Proc. §§ 6-201-02 because the acts, omissions, and/or injuries that give rise to the claims herein occurred, in whole or in part, in Montgomery County, Maryland, and Mike resides in said county.

FACTUAL ALLEGATIONS

The Parties

15.    Dr. Candace Pert (1946-2013) was an internationally recognized neuroscientist and pharmacologist who published over 250 research articles and was a significant contributor to the emergence of mind-body medicine as an area of legitimate scientific research in the 1980's. She discovered the elusive opiate receptor, a major step in the advancement of neuroscience. She became Chief of the Section on Brain Biochemistry, Clinical Neuroscience Branch, at the National Institute of Mental Health ("NIMH") in 1983. In 1986, she and her scientific partner and co-inventor of their patented properties, plaintiff Dr. Michael Ruff, invented what appeared to be the first HIV entry inhibitor, another first-of-its-kind discovery that established an entirely new class of drugs. Her 1997 book, *Molecules of Emotion, Why you Feel the Way you Feel* (Scribner), received wide acclaim for its bridging of science and psychosomatic medicine.

4

16.    Candace was survived by her then husband of 27 years, Dr. Michael Ruff. Mike, also a research scientist, and Candace lived and worked together in Maryland. They invented, developed, commercialized, and patented numerous drugs in the fields of neuropeptides. They founded Rapid Pharmaceuticals, a biotechnology company focused on the use of small peptides to stop the spread of immune and inflammatory disease.

17.    In 2017, Mike founded a new company Creative Bio-Peptides, a company that is developing new orally active drug analogs for chronic pain, dementias, chronic traumatic encephalopathy, skin disorders, and brain injury. Mike is the President and CEO of Creative Bio-Peptides, the former President and Chief Scientific Officer of Rapid Pharmaceuticals, a former Associate Research Professor at Georgetown University Medical School, and a former immunologist and virologist at NIH.

18.    Mike is not a public figure. He is not a celebrity, a well-known personality, or one who injected himself into a public controversy on the subject of the defamatory statements.

19.    Defendant Pamela Ryckman is a writer. She has authored numerous books and written for the New York Times, Financial Times, and Washington Post.

20.    Defendant Hachette Book Group, Inc. ("Hachette") is a publisher and provides custom distribution, fulfillment, and sales services to other publishing companies. Hachette prides itself on a relentless focus on how to sell the most books, games, gifts, and puzzles. Hachette promotes Ryckman as one of its many authors and contributors.

## The Book

21.     Ryckman authored the Book. She was inspired to write it from the life of Candace and Candace's *Molecules of Emotion* book.

22.     Ryckman, with Hachette, first published or caused the publication of the Book on November 7, 2023.

23.     Hachette also edited the Book, including during the time when Mike was added as a "villain" and the Book "became a different story entirely." According to Ryckman, Hachette's editor, Lauren Marino, provided "vision and insight" to "shape[ ] a complex tale." Defendants worked jointly and collaborated on the Book and knew or had reason to know of the defamatory statements before, during, and after they were published.

24.     Defendants published or caused the publication of the Book through bookstores, direct sales, and the internet to readers in Maryland, other states, and internationally. The Book is sold in hardcover, e-book, and audiobook download via defendants or their electronic links and connections to Amazon, Barnes & Noble, Target, Walmart, and other retail bookstores.

25.     Maryland residents, local and national media, and others have read the Book.

## The Defamatory Statements

26.     In general, defendants present the Book as the "untold story" of Candace, who was "besieged by bloodsuckers keen to profit from her brilliance, until she too succumbed to greed."

27.     Defendants cast Mike in the Book as one of these "bloodsuckers," claiming that "Michael wants what so many have desired—to profit from Candace's genius, following her beloved rainbow toward a pot of gold."

28.     The Book, however, is not a true story, containing false and defamatory statements about Mike (and Candace).

29.     Specifically, defendants made and published false, misleading, defamatory, offensive, and disparaging statements about Mike in the Book as follows:

a.     *Government Fraud & Violations*

i.     "Rather than implicate himself and Candace in an illegal drug ring, which would be problematic even if the couple hadn't been federal government employees, Michael insists that Wynne and Larry Kwart acted alone." [page 135]

ii.     "Given that, as a federal agency, the NIH forbids its employees from using government labs and resources for personal gain, Candace and Michael found themselves in a pickle." [page 154]

iii.     "After the couple had been banished from the NIH for disseminating Peptide T underground and using federal government labs to launch a commercial venture, the NIH had agreed not to prosecute on the condition that Candace and Michael leave quietly." [page 241]

iv.     "Kachroo, Mark Lloyd-Fox, and Vivian Komori also claim that the couple falsified documents to the FDA and Whitman-Walker Clinic." [page 245]

v.     "So to avoid being exposed, Candace and Michael misled Whitman-Walker officials and illicitly made Peptide T at Rapid Labs." [page 245]

vi.     "Somehow, NIH officials have forgotten or overlooked the couple's scandals and instead have opened their wallets. Despite misusing federal labs and being reproved multiple times by the NIH's Office of Technology Transfer for patent infringements, Michael has managed to secure more than $6 million in new grants from three separate NIH institutes." [page 266]

b.     *Investor Fraud*

i.     "This meant that Rapid had been launched on a lie, as Candace and Michael had no legal right to develop the drugs they claimed to own." [page 239]

ii.     "Rapid AG did not hold any valid title or assets, yet Candace and Michael proceeded to recruit unwitting investors, raising millions of dollars on intellectual property they did not own and were forbidden from monetizing." [page 243]

iii.     "Despite any claims to the contrary, Candace and Michael had been working on Peptide T all along, and Rapid AG was a house of cards." [page 243]

iv.     "Unable to sway Galpin, Kachroo flew around the globe informing Rapid's shareholders of the couple's alleged IP fraud. Initially she was stunned when some didn't seem fazed—until she realized that they already knew!" [page 246]

v.      "After the meeting in San Francisco in January 2015 at which Kachroo uncovered Michael's alleged patent fraud, she became 'public enemy number one.'" [page 261]

vi.     "Still, he forges ahead in his new firm, Creative Bio-Peptides, trying to commercialize a patent for RAP-103, the last compound Candace created before she died. Though Rapid AG alumni maintain that RAP-103 is yet another Peptide T derivative and thus the property of MerriBeth Adams and Peptide T Holdings, Michael paints it as a trump card. After all, he wants '$8 million in [his] bank account, not a half-million in [his] bank account,' he says, and he appears to be on his way." [pages 265-266]

c.      *Involvement in Candace's Death*

i.      "'He was yelling at my mom, and she was saying, Please, Michael. No, no, no!'" Evan says. "'He didn't know we were there. We listened to him yelling for ten minutes....I'd never seen him hit her, but he had a rage we'd seen—a whole other side that existed.'" [page 219]

ii.     "In light of Rapid's internecine battles and Candace's vow to come clean, her family and friends found the timing of her death uncanny. Naturally, one wonders if the cause was confirmed by an autopsy. 'No, no autopsy,' Michael says, explaining that in Maryland, an investigation is not mandated if someone has died at home alone." [page 254]

iii.    "No forensics investigation was ever performed; EMTs simply arrived at the house and took Candace's body straight to the hospital. While her time of death was unconfirmed, it feels to Candace's children curiously close to the moment she wrote her final email in support of Kachroo. The email was sent at 12:43 p.m. and, according to Padma Oza, Michael left the office shortly after receiving it. It would have taken him ten minutes to drive home, and Evan and Vanessa say that he called them at around 1:25 p.m. to report that their mother was dead." [page 254]

iv.     "The week before she died, Candace met her daughter, Vanessa.... As they were leaving, Candace became agitated in the parking lot and told Vanessa that Michael was having yet another affair and wanted a divorce, and that he'd made her change her will, but that Candace was planning to change it back. 'My mom made it sound like Michael didn't love her, that he was after money, notoriety, research,' Vanessa recalls. 'She was very distraught.'" [page 255]

v.      "Candace's family acknowledges that she would have resisted going to the hospital, as she equated it with being institutionalized. But they cannot understand why Michael didn't call an ambulance, or at least summon Evan to intervene, as he had done every other time Candace grew problematic." [page 256]

vi.    "The day of Candace's death, Michael seemed stoic when he phoned Evan, yet when Vanessa arrived two hours later at Adventist HealthCare Shady Grove Hospital in Rockville, where Candace's body was taken, she found her stepfather wailing and throwing medical equipment around the room. As Michael was erupting, a hospital worker entered to ask whether he wanted an autopsy performed and Michael declined." [page 256]

vii.    "Michael's subsequent behavior seemed crass and insensitive to friends and family as well." [page 256]

viii.    "Michael's conduct in other areas of life proved unsettling to family and friends as well." [page 257]

ix.    "At that point, Candace's children were still trying to maintain a relationship with their stepfather; he'd always been awkward, they say, but they didn't want to believe he was evil. Yet when Michael's conduct became too distressing to ignore, Candace's children demanded to see her will and trust." [page 260]

x.    "However, when Candace's children got hold of it, they found it in contradiction with her expressed wishes; Michael was now the recipient of all assets and they had been entirely cut out." [page 261]

xi.    "After an exhaustive survey of Michael's comportment and correspondence, [Evan] delivered a binder of evidence he'd collected to the police in Rockville, who remain stumped by a lack of physical evidence. 'The detective said, In Maryland, no body, no crime. Without an autopsy, they couldn't do an investigation,' Evan says. 'No one would do an investigation. They said we'd waited too long, but in the moment, we were in shock. Even if we were suspicious, it was so quick, we had no time.'" [page 262]

30.    Overall, these defamatory statements falsely accused—directly and by implication—Mike of fraud, lies, deceptive business practices, illegal acts, and crimes.

31.    Defendants presented these statements, by content and context, as factual statements, not opinion.

32.    Indeed, defendants presented the Book—from the outset, in the inside jacket—as a truthful "untold story" about Candace's life based on "full access to Candace's family, friends, colleagues, personal papers, and research." Defendants also presented the Book as an "objective journalistic report."

33.     Defendants even included a sources section in the Book containing what they claim as factual sources they relied on for the Book, including references to witness interviews and various articles, journals, contracts, and business and legal documents.

34.     In short, defendants presented the Book as conveying facts not fiction or opinion. As such, readers did and would understand the defamatory statements as factual statements.

35.     The defamatory statements are capable of being proven true or false: Mike either did or did not engage in the alleged fraud, illegality, or criminality. And he did not.

### *The Falsity of the Defamatory Statements*

36.     Mike did not defraud the government or violate drug laws as alleged. He did not distribute drugs in violation of the law. He did not use NIH laboratories in violation of the law. NIH never "banished," "reproved," or terminated him (or Candace). Mike did not submit false documents to or mislead the FDA or Whitman-Walker Clinic.

37.     Mike did not defraud investors about intellectual property as alleged. Mike and Candace invented, developed, commercialized, and patented numerous drugs in the field of neuropeptides. They used intellectual property for those drugs for the benefit of the public, themselves, and their investors without deception.

38.     Mike was not involved in Candace's death as alleged. She died of natural causes.

### **The Fault behind the Defamatory Statements**

39.     The truth did not matter to defendants who intended to generate more interest in, and money from, the Book by adding the defamatory statements.

40.     Defendants made and published the defamatory statements knowing they were false or recklessly disregarding the truth.

41.    Defendants referenced various documents as sources for the defamatory statements, but those documents do not show that Mike distributed drugs in violation of the law, used NIH laboratories in violation of the law, submitted false documents to or misled the FDA or Whitman-Walker Clinic, defrauded investors about intellectual property, or had anything to do with Candace's death.

42.    In fact, source documents and public information show, among other things, that NIH knew of and allowed Mike to use its research laboratories; that NIH licensed the commercial use of research drugs to companies owned or associated with Mike; that Mike disclosed to the FDA where drugs were and would be manufactured for clinical trials at the Whitman-Walker Clinic; that Mike and companies owned or associated with him filed uncontested patents on drugs and owned rights to intellectual property; that Mike has never been convicted of any crime or found liable for any wrong; and that Candace died of natural causes.

43.    Defendants principally relied on Evan Pert, his domestic partner Nancy Kingcaid, and Gaytri Kachroo as witness sources for the defamatory statements, but those persons, as defendants knew or should have known, were incredible or biased against plaintiff.

44.    Mr. Pert is Mike's estranged stepson.  He has competed against Mike and his business interests, attempted to take over companies owned or associated with Mike, threatened to harm Mike (leading to a public restraining order against Mr. Pert), and accused Mike of murdering Candace, Mr. Pert's mother.

45.    Ms. Kingcaid is Mr. Pert's long-time domestic partner.  Defendants interviewed Ms. Kingcaid and Mr. Pert together on at least eight occasions.

46.    Finally, Ms. Kachroo is Mike's former lawyer and business associate.  Ms. Kachroo, like Mr. Pert, has competed against Mike and his business interests, attempted to take

over companies owned or associated with Mike, and filed criminal and civil charges—all dismissed—against Mike. Public records show that courts have rejected Ms. Kachroo's claims of fraud against Mike and found that Ms. Kachroo engaged in multiple incidences of attorney misconduct, including conflicts of interest (related to her work for Mike), misappropriation of client funds, and overbilling.

47.    Defendants could have relied on, but purposefully avoided, sources such as Mike, Rapid Pharmaceuticals directors, government officials, and patent searches on the internet, which would have shown defendants the falsity of the defamation statements.

48.    Defendants had their own bias, hostility, and ill will toward Mike. Beyond the defamatory charges, defendants called Mike greedy, "selfish," a "swindler," a "villain," and, together with Candace, drug "kingpin[s]" and "pariahs in the world of science."

49.    Moreover, defendants "sought Michael's help facilitating interviews with associates who might fill in the gaps," yet refused to answer questions from Mike about the contents of the Book. They never told Mike about the defamatory statements, much less told him that the Book was anything other than a biography of Candace when, in reality, it was a hit piece.

50.    To be clear, defendants made no effort to verify the truth or accuracy of the defamatory statements with Mike himself. They didn't want to because that could interfere with their narrative and access to witnesses and information through Mike.

51.    At a minimum, defendants made and published the defamatory statements negligently, without exercising a reasonable level of care and diligence to ascertain the truth. They failed to carefully review their own sources or public records or otherwise investigate the defamatory charges made against Mike. They departed from journalistic and publishing standards in order to tell their false and defamatory story.

52.    Defendants refuse to take down and retract the defamatory statements notwithstanding having been informed of the falsity of the statements. To this day, the Book and the defamatory statements remain published in their original form in hard copy and online in Maryland, other states, and internationally, for reading and re-publishing by others.

### The Damage Caused by the Defamatory Statements

53.    Readers of the defamatory statements did and would think less of Mike because of the defamatory statements, believing him to be a fraudster and criminal. His standing in the community has been questioned and discredited.

54.    As a result, Mike suffered damage to his personal and professional reputation, emotional distress, mental pain and suffering, embarrassment, humiliation, and aggravation.

55.    The full extent of the damage caused by defendants is not yet known, but the defamatory statements caused and continue to cause Mike serious personal and professional injury.

### CLAIMS

### Count I (Defamation)

56.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

57.    Defendants made and published the defamatory statements about plaintiff, without privilege or justification, through direct statements, implications, repeating statements of others, and adopting and endorsing those statements.

58.    Defendants published the defamatory statements to third parties, by and through bookstores, direct sales, and the internet to readers in Maryland, other states, and internationally, in the form of hardcover, e-book, and audiobook download.

59. The defamatory statements accused plaintiff—a scientist, businessman, and husband to late wife Dr. Candace Pert—of fraud, lies, deceptive business practices, illegal acts, and crimes.

60. Readers of the defamatory statements did and would think less of plaintiff because of the defamatory statements, believing him to be a fraudster and criminal.

61. The defamatory statements are defamatory per se, for which separate proof of harm is not required.

62. The defamatory statements tend to lower plaintiff's reputation in the estimation of the community and/or deter third persons from associating or dealing with him.

63. The defamatory statements were and are still false. Plaintiff did not defraud the government, violate drug laws, defraud investors, or have involvement in his late wife's death.

64. Defendants made and published the defamatory statements knowing they were false or recklessly disregarding the truth.

65. At a minimum, defendants made and published the defamatory statements negligently, without exercising a reasonable level of care and diligence to ascertain the truth.

66. As a direct and proximate result of the per se defamatory statements and/or defamatory statements made with actual malice, plaintiff suffered and continues to suffer presumed damages in an amount to be determined at trial.

67. As a direct and proximate result of the defamatory statements, plaintiff suffered and continues to suffer damage to his personal and professional reputation, emotional distress, mental pain and suffering, embarrassment, humiliation, and aggravation in an amount to be determined at trial.

68.    Defendants' conduct was willful, malicious, intentional, wanton and/or reckless, thereby entitling plaintiff to an award of punitive damages in an amount to be determined at trial.

**Count II (False Light)**

69.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

70.    Defendants made false and highly offensive statements about plaintiff, including that he engaged in fraud, lies, deceptive business practices, illegal acts, and crimes.

71.    Defendants gave publicity to these statements, by and through bookstores, direct sales, and the internet to readers in Maryland, other states, and internationally, in the form of hardcover, e-book, and audiobook download.

72.    Defendants either knew that these statements were false and would place plaintiff in a false light, or they acted with reckless disregard as to the falsity of these statements and the false light in which plaintiff would be placed.

73.    These statements placed plaintiff in a false light and would be highly offensive to a reasonable person.

74.    As a direct and proximate result of defendants' conduct, plaintiff suffered and continues to suffer emotional distress, mental pain and suffering, embarrassment, humiliation, aggravation, financial and other damages and losses in an amount to be determined at trial.

75.    Defendants' conduct was willful, malicious, intentional, wanton and/or reckless, thereby entitling plaintiff to an award of punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests judgment against defendants, jointly and severally, for the following:

1.     Presumed, compensatory, and punitive damages in an amount exceeding $75,000, to be proven at trial.

2.     Costs, expenses, and/or attorney fees as allowed by law.

3.     Pre- and post-judgment interest as allowed by law.

4.     Equitable relief, including orders that enjoin the continued publication of the defamatory and false light statements and require defendants to retract and remove all prior publications of those statements, as allowed by law.

5.     Any other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: November 1, 2024                  Respectfully submitted,

/s/ Joseph L. Meadows
Joseph L. Meadows, Esq.
(Md. Bar No. 9801080019)
**Gordon Rees Scully Mansukhani, LLP**
277 S. Washington St., Suite 550
Alexandria, VA 22314
Phone: (703) 650-7011
Facsimile: (202) 800-2999
jmeadows@grsm.com

*Counsel for Plaintiff Michael Ruff*